## AFFIDAVIT OF SPECIAL AGENT IN SUPPORT OF COMPLAINT AND ARREST WARRANTS

I, Special Agent Gina Galantino, being sworn, state:

## INTRODUCTION

1.      I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since 2020. I am currently assigned to the Boston Field Office. I am a graduate of the Federal Law Enforcement Training Center, where I completed ATF Special Agent Basic Training and the Criminal Investigator Training Program. During the course of my law enforcement career, I have participated in the execution of state and federal search and/or arrest warrants for violations of firearms and controlled substance laws.

2.      As a Special Agent for ATF, some of my duties include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, firearms manufacturing and violent crimes involving firearms and narcotics trafficking. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms. I have been the affiant on affidavits in support of federal search warrants and arrest warrants. I have participated in and performed surveillance and made arrests of firearm and narcotics traffickers who utilize their electronic devices to further their illegal activity. During the course of my professional experience, I have interviewed numerous defendants, witnesses, victims, confidential informants, and other police officers regarding the illegal trafficking of firearms.

3.      During my tenure with ATF, I have written and/or participated in the execution of federal search warrants, and have debriefed defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized me with: (1) the manner

in which illegal guns are brought into this state and sold; (2) firearm and narcotics traffickers' methods of operation, including their acquisition, storage, and transportation of both illegal guns and drugs; and, (3) the widespread utilization of cellular telephones in the course of such activities.

## PURPOSE OF THIS AFFIDAVIT

4.    This affidavit is being submitted in support of an application for a criminal complaint and arrest warrants for Anderson GUERRERO ("GUERRERO"), DOB XX/XX/1998, Estarlin RODRIGUEZ ("RODRIGUEZ"), DOB XX/XX/1997 and Edwin GOMEZ ("GOMEZ"), DOB XX/XX/2001.

5.    There is probable cause to believe that GUERRERO, RODRIGUEZ and GOMEZ have committed the following federal crimes: (1) engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A), (2) conspiracy to engage in the business of dealing in firearms without a license in violation of 18 U.S.C. § 371, (3) firearms trafficking and conspiracy to do so, in violation of 18 U.S.C. § 933, and (4) possession of a firearm by an illegal or unlawfully present alien in violation of 18 U.S.C. § 922(g)(5); hereinafter, the "TARGET OFFENSES."

6.    I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint. Accordingly, I have not included each and every fact known to me, and other law enforcement officers involved in this investigation. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation.

## PROBABLE CAUSE

I.    **Background of Investigation**

7.    Beginning in or around June 2025, the ATF and Homeland Security Investigations ("HSI") began investigating GUERRERO, RODRIGUEZ and GOMEZ for their involvement in

2

the illegal sale of firearms based on a tip from ██████████████████████ ("CD-1")[1].

8. In the past several months, ATF has made controlled purchases from GUERRERO, RODRIGUEZ and GOMEZ, resulting in the acquisition of 19 firearms. Notably, one of the pistols purchased was a Glock with a metal machinegun conversion device (MCD) and an obliterated serial number.

9. During the course of this investigation, I have learned that neither GUERRERO, RODRIGUEZ, nor GOMEZ are licensed to deal in firearms.

10. During the course of this investigation, I also learned from HSI agents that GUERRERO and RODRIGUEZ are present in the United States unlawfully.

11. RODRIGUEZ is a citizen of the Dominican Republic. He has previously been encountered by United States Customs and Border Protection (CBP) agents, and has an Alien file ("A file"), number A216648925. According to RODRIGUEZ's Interstate Identification Index records, on January 14, 2021, RODRIGUEZ was charged with being an inadmissible alien in violation of 8 U.S.C. § 1182. According to agents I have spoken with from HSI who have reviewed records in HSI law enforcement databases, RODRIGUEZ was removed pursuant to an expedited removal order at that time.

12. GUERRERO is also a citizen of the Dominican Republic. I have reviewed a copy of his Dominican personal identification card. According to agents from HSI, at an unknown date and

---

[1] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

unknown location, GUERRERO entered the United States without inspection.  Because GUERRERO has never been inspected upon entry, he does not have an A-file.

13.    For each of the controlled purchases described below, law enforcement followed the following procedures: law enforcement officers first searched CD-1's vehicle for money and contraband, with negative results. Agents then provided CD-1 with government funds and a recording device for use in the purchase. Investigators then directed CD-1 to make a controlled purchase of firearms, and conducted surveillance while CD-1 drove to a prearranged location to meet GUERRERO, RODRIGUEZ, and/or GOMEZ, throughout the transaction, and as CD-1 drove back to a prearranged meet location to meet with investigators. There, agents retrieved the firearms, any additional evidence, the recording, and again searched CD-1's vehicle for contraband and money, with negative results.

**July ███ 2025 Controlled Purchase**

14.    In or around ███ 2025, CD-1 made contact with GUERRERO via telephone.  During those conversations, GUERRERO informed CD-1 that he had three firearms for sale. CD-1 agreed to purchase the three firearms on or around July ██ 2025.

15.    On or around July ██ 2025, GUERRERO arranged to meet CD-1 in the area of ████████████████████████. A short time later, CD-1 arrived in the area. According to CD-1, CD-1 then received a message from GUERRERO indicating a new meeting location ████████ ████████████████████ CD-1 proceeded to that address, where RODRIGUEZ[2] entered the front

---

[2] RODRIGUEZ's face was not visible in this recording.  In the recording from the July ██ 2025 purchase, RODRIGUEZ's face was visible, and I was able to identify him based on his photo contained in HSI databases.  After identifying RODRIGUEZ, I was able to identify him in other recordings, including from the July ██ 2025 purchase, based on his voice and on CD-1's identification.

4

passenger seat and GUERRERO[3] entered the rear passenger seat of CD-1's vehicle. Shortly afterward, RODRIGUEZ exited the vehicle while GUERRERO remained in the backseat. At this point, according to CD-1, GUERRERO instructed CD-1 to drive to a new location. A short time later, GUERRERO directed CD-1 to proceed to the area of ████████████████████████████.

16.     Based on the debriefing of CD-1 and a review of the audio/video recording of the event, in sum and substance, the following events occurred.

17.     When they arrived in the area of ████████████████, GUERRERO exited the vehicle. A short time later, GUERRERO reentered the front passenger seat, and GOMEZ entered the back passenger seat with a guitar case. According to CD-1, the guitar case contained three firearms, a magazine loaded with 13 rounds of 9mm ammunition, and one rifle magazine. The three individuals engaged in conversation. During this time, GOMEZ transferred three firearms to CD-1, including a Glock, 19GEN4, 9mm pistol equipped with a metal MCD, and an obliterated serial number; a Matrix Aerospace Corporation, M556-SC, multi caliber pistol bearing serial number SC556-17947; and a Mossberg, 500, 12-gauge shotgun, bearing serial number T947220; ammunition, and two magazines in exchange for $3,500. Shortly thereafter, CD-1 also paid GUERRERO $1,500 and departed the area.

18.     Based on my training and experience, I know that Glock pistols, Matrix Aerospace Corp. pistols, and Mossberg pistols are manufactured outside of Massachusetts. Based on my training and experience, I am also aware that it is a felony violation of 18 U.S.C. § 922(k) to knowingly receive a firearm which has had the serial number removed, obliterated, or altered where that firearm has been

---

[3] GUERRERO and GOMEZ's faces are visible in the video recording from this purchase. I was able to identify GUERRERO based on his photo from his Dominican identification card. I was able to identify GOMEZ based on his photo from Massachusetts RMV records and law enforcement databases. GUERERRO and GOMEZ's faces were not visible in all of the subsequent recordings. In instances where their faces were not visible, I was able to identify them based on their voices and on CD-1's identification.

shipped or transported in interstate commerce.

### July ⬛ 2025 Controlled Purchase

19.     In or around July 2025, CD-1 made contact with GUERRERO via telephone. During these conversations, GUERRERO informed CD-1 that he had four firearms for sale. CD-1 agreed to purchase the four firearms on July ⬛ 2025.

20.     On or around July ⬛ 2025, CD-1 informed investigators that GUERRERO instructed CD-1 to meet RODRIGUEZ to conduct the controlled purchase of the four firearms. CD-1 was instructed to go to the area of ⬛⬛⬛⬛⬛⬛⬛.

21.     Based on the debriefing of CD-1 and the review of the audio/video recording, in sum and substance, the following events occurred. CD-1 was speaking to RODRIGUEZ via telephone as he drove to the predetermined location, and was instructed by RODRIGUEZ to pull over at ⬛⬛⬛. At this time, RODRIGUEZ entered the front seat of CD-1's vehicle and transferred four firearms to CD-1, including a Mossberg, 590, 12-gauge shotgun bearing serial number V1710124; a HS Produkt, XD45, .45 caliber, pistol bearing serial number US567241; and two privately-made firearms (PMF, or "ghost guns") in exchange for $6,800. A short time later, RODRIGUEZ exited the vehicle and CD-1 departed the area.

22.     Based on my training and experience, I know that Mossberg shotguns and HS Produkt pistols are manufactured outside of Massachusetts.

### July ⬛ 2025 Controlled Purchase

23.     In or around July 2025, CD-1 made contact with GUERRERO via telephone. During these conversations, GUERRERO informed CD-1 that he had seven firearms for sale. CD-1 agreed to purchase the seven firearms on July ⬛ 2025.

24.     On or around July ⬛ 2025, GUERRERO instructed CD-1 to go to the area of

███████████████████████ .

25. Based on the debriefing of CD-1 and the review of the audio/video recording, in sum and substance, the following events occurred. CD-1 arrived at ████████████, where RODRIGUEZ entered the rear passenger seat. Shortly after, GUERRERO opened the rear passenger door, placed a bag in the backseat of CD-1's vehicle, and then entered the front passenger seat. CD-1 observed GUERRERO exit a building in the area. A short time later, CD-1 retrieved the bag from the backseat and removed a rifle. CD-1 also retrieved an orange Nike box and a black handgun box from the backseat, both of which also contained firearms. CD-1 informed investigators that RODRIGUEZ had brought those boxes. A short time later, GOMEZ arrived with a bag holding two additional firearms, a rifle and a revolver. GOMEZ handed the bag to GUERRERO who was in the front seat, who then transferred the firearms to CD-1. Following the transaction, CD-1 observed GUERRERO exit the vehicle, and return to the building he had come from, and RODRIGUEZ and GOMEZ went their separate ways.

26. According to CD-1, the payments were as follows: $3,400 to GUERRERO for one rifle; $6,400 to RODRIGUEZ for five pistols; and $4,300 to GOMEZ for one rifle and one revolver. CD-1 further advised that RODRIGUEZ supplied the five pistols for $6,400, but one pistol was "fronted," leaving CD-1 owing RODRIGUEZ $1,500 at a later date. Also, included with the firearms were multiple rounds of assorted ammunition. The eight firearms purchased were a Del-ton, DTI-15, 5.56, rifle, bearing serial number DTI-S174705; an HS Produkt, XDS, 9mm, pistol, bearing serial number S3804159; a Taurus, PT111 G2, 9mm, pistol, bearing serial number TKM41246; a Walther, P22, .22, pistol, bearing serial number L028141; a German Sport Guns, 1911, .22, pistol, bearing serial number A361961; a Walther, PPQ, 9mm, pistol, bearing serial number FCF1353; a Smith & Wesson, 629 Classic, .44, revolver, bearing serial number CFS4605; and a DPMS, A15, .223, rifle, bearing

serial number N0001687.

27.     Based on my training and experience, I know that Del-ton rifles, HS Produkt pistols, Taurus pistols, Walther pistols, German Sports Guns pistols, and DPMS rifles are manufactured outside of Massachusetts.

**August ▇ 2025 Controlled Purchase**

28.     In or around August 2025, CD-1 made contact with GUERRERO via telephone. During these conversations, GUERRERO informed CD-1 that he had four firearms for sale. CD-1 agreed to purchase the four firearms on August ▇ 2025.

29.     On or around August ▇ 2025, CD-1 informed investigators that GUERRERO instructed CD-1 to meet RODRIGUEZ to conduct the controlled purchase of the four firearms. CD-1 was instructed to go to an address in ▇▇▇▇▇▇.

30.     Based on the debriefing of CD-1 and the review of the audio/video recording, in sum and substance, the following events occurred. According to CD-1, CD-1 was in contact with RODRIGUEZ via telephone when RODRIGUEZ instructed CD-1 to pull over in front of the predetermined address. At this time, CD-1 observed RODRIGUEZ exit the building carrying a black plastic bag.  From there, RODRIGUEZ entered the front seat of CD-1's vehicle and handed him the bag, within which was a green box containing four firearms and 50 rounds of .40 caliber ammunition. CD-1 gave RODRIGUEZ $7,800 in exchange for the firearms and ammunition. The firearms RODRIGUEZ transferred to CD-1 included a Smith & Wesson, 3906, 9mm, pistol, bearing serial number TDB2605; an HS Produkt, XD-40, .40 caliber, pistol, bearing serial number XD484975; and two PMFs. Following the transaction, RODRIGUEZ reentered the building at the address.

31.     Based on my training and experience, I know that HS Produkt pistols are manufactured outside of Massachusetts.

32.     In total, CD-1 purchased 19 firearms from RODRIGUEZ, GUERRERO, and GOMEZ. Based on my training and experience, I believe that RODRIGUEZ, GUERRERO, and GOMEZ obtained those firearms unlawfully.  Specifically, law enforcement traced the firearms containing serial numbers, and none of those firearms were originally purchased by RODRIGUEZ, GUERRERO, or GOMEZ.[4]  Of those, two of the firearms were previously reported as stolen.[5]  Additionally, some of the firearms were privately made (bearing no serial number), and one of the firearms had an obliterated serial number.

33.     Following the controlled purchases described above, GUERRERO, who organized each of the completed transactions, has been in continuous contact with CD-1 regarding the purchase of firearms.  On or about September ██ 2025, GUERRERO sent images of firearms via text message to CD-1 and asked if CD-1 was interested in purchasing.  On or about November ██ 2025, GUERRERO sent an image of a rifle to CD-1 via text message indicating that the rifle was for sale.

**CONCLUSION**

34.     Based on the foregoing, I believe probable cause exists to conclude that from July 2025 to present, GUERRERO, RODRIGUEZ and GOMEZ, without being a federally licensed dealer, did knowingly and willfully engage in the business of dealing in firearms and firearms trafficking, in violation of 18 U.S.C. § 922(a)(1)(A),and during that same time period, did knowingly combine, conspire, confederate and agree with each other and others, to engage in the business of dealing in firearms without a federally issued license to do so, in violation of 18 U.S.C. § 371.

---

[4] CD-1 reported that a third party supplied the firearms that GUERRERO, RODRIGUEZ, and GOMEZ sold to him.  That individual was also not listed as the original purchaser of any of the firearms.

[5] One firearm, a Smith & Wesson Revolver, was reported stolen on July 20, 2020.  The other, a SPMS Rifle, was reported stolen on July 2, 2011.

35.     Further, there is probable cause to conclude from July 2025 to present, GUERRERO, RODRIGUEZ, and GOMEZ did conspire to transfer a firearm to another person in interstate commerce knowing or having reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony, in violation of 18 U.S.C. § 933(a).

36.     Finally, there is probable cause to conclude that GUERRERO and RODRIGUEZ violated 18 U.S.C. § 922(g)(5), being in possession of a firearm while unlawfully present in the United States.

Accordingly, I respectfully request that the Court issue the requested criminal complaint.

_Gina Galantino (by JDH)_
Gina Galantino
Special Agent, ATF

SWORN to me telephonically in accordance with Fed. R. Crim. P. 4.1 on this date of November 5, 2025.

HON. JESSICA D. HEDGES
UNITED STATES MAGISTRATE JUDGE

10